UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MARK SCANZILLO, )<br>)<br>Petitioner, )<br>)<br>v. )<br>)<br>JOHN J. O'BRIEN, Commissioner of )<br>Probation, et al. )<br>)<br>Respondents. )<br>) | Civil Action No. 09-11220-DPW |

### RESPONDENT'S MEMORANDUM OF LAW IN OPPOSITION TO
### PETITION FOR WRIT OF HABEAS CORPUS

Respondents John J. O'Brien and Harold W. Clarke respectfully submit this memorandum of law in opposition to the petition for a writ of habeas corpus filed by Petitioner Mark Scanzillo. Petitioner challenges his state court convictions for rape (two counts) and indecent assault and battery on a person over fourteen years of age, on the grounds that his trial counsel was ineffective for failing to pursue discovery of the victim's medical and psychiatric records and for failing to present character evidence favorable to petitioner. Petitioner also claims that the Massachusetts Superior Court applied an inappropriate, subjective standard in deciding his motion for new trial. This Court should deny the petition on the merits because, on appeal, the Massachusetts Appeals Court ("MAC") applied the correct legal standard to petitioner's ineffective assistance claim, and the result it reached was neither contrary to nor an unreasonable application of clearly-established federal law. *See* 28 U.S.C. § 2254(d).

### PRIOR PROCEEDINGS

On November 6, 2000, petitioner was indicted for three counts of indecent assault and battery on a person fourteen years of age or over and two counts of rape. App. 4, 15. Following a

jury-waived trial in Plymouth Superior Court, the court found petitioner guilty of two counts of rape and one count of indecent assault and battery. App. 6, 15. Petitioner was acquitted of the remaining charges. App. 6, 15. The trial court ordered a pre-sentence investigation and continued the case for disposition. App. 6. On January 26, 2005, the Superior Court sentenced petitioner to two to three years committed, followed by three years probation. App. 6-7. Petitioner appealed and subsequently moved for a new trial on the basis that his trial counsel was ineffective. App. 7. Petitioner sought and obtained additional discovery in support of the motion for new trial. *See* App. 7-14.

After hearing, the motion court, which was also the trial court, denied petitioner's motion for new trial, and petitioner appealed. App. 14. The two appeals were consolidated, and on May 1, 2008, the MAC affirmed petitioner's convictions and the denial of the motion for new trial, in an unpublished decision, *Commonwealth v. Scanzillo*, 71 Mass. App. Ct. 1122, 2008 WL 1901420 (May 1, 2008) (table, text in Westlaw), App. 502-06. Petitioner submitted an application for leave to obtain further appellate review ("ALOFAR") to the Supreme Judicial Court ("SJC"), which was denied. *Commonwealth v. Scanzillo*, 452 Mass. 1102 (2008) (table), App. 559. The instant petition ("Pet.") followed on July 17, 2009. The petition set forth three grounds for review:

> Ground One: "Ineffective assistance of counsel, in violation of the Sixth Amendment right to effective counsel under Strickland v. Washington," based on trial counsel's failure to pursue medical and psychological records of victim and failure to present evidence of petitioner's good character, *see* Pet. at 6;
>
> Ground Two: "The trial court refused to follow the test set out in Strickland, supra, in considering the failure of my trial lawyer to obtain and present medical, psychiatric and character evidence, using her personal opinion instead of Strickland's standard," *see* Pet. at 8;

> Ground Three: "Denial of 5th Amendment due process right to have been given adequate notice of the full loss of rights involved in a waiver of my Sixth Amendment right to a trial by jury and said denial means that I did not knowingly, intelligently, and voluntarily waive my right to trial by jury; and inadequate waiver of said right to trial by a jury," *see* Pet. at 9.

Respondents moved to dismiss the petition, on the basis that Ground Three was unexhausted. *See* Dkt # 9, 10. This Court agreed with respondents, and pursuant to petitioner's request to proceed with any exhausted claims, the Court deleted Ground Three as a freestanding claim. *See* Dkt # 18.

## STATEMENT OF FACTS

On January 4, 2000, Sadie Jones[1] was nineteen years old. (Tr. I, 47). She was a freshman in college and was home for her winter break. (Tr. I, 52-53). Sadie had been babysitting for petitioner's family off and on since 1998. (Tr. I, 48-49). She also taught the children swimming. (Tr. I, 50). She had developed a very friendly relationship with petitioner's wife, like an older sister. (Tr. I, 51). That afternoon, petitioner's wife, Maura, called and asked Sadie to babysit while Maura went out to an appointment. (Tr. I, 53-54). Sadie agreed and went over to the Scanzillo house during the mid- to late afternoon. (Tr. I, 54). A little later, petitioner came home and asked the victim to remain longer so that he and his wife could go out to dinner. (Tr. I, 54).

Petitioner and his wife returned home from dinner at about 10:00 p.m. (Tr. I, 55). The weather was bad that night, very rainy and windy, so at the Scanzillos' suggestion, Sadie called her father, and everyone agreed it would be best if she spent the night there. (Tr. I, 56). There was a guest bedroom set up in the basement. (Tr. I, 57). Both petitioner and his wife appeared to

---

[1] Sadie Jones is a pseudonym used to refer to the victim. The same pseudonym was used in the parties' briefs before the Massachusetts Appeals Court. "Tr. [volume], [page]" refers to the Superior Court trial transcript. Volumes I, IV, and V of the trial transcript have been filed manually with this Court, with redactions to obscure the victim's name and other identifying information regarding the victim.

have been drinking. (Tr. I, 57, 59-60). "They were just giddy, you know, happy go lucky." (Tr. I, 59). Petitioner, his wife, and Sadie sat in the living room, and they all had some wine. (Tr. I, 61, 63-64).

After a period of casual conversation, petitioner's wife fell asleep on the couch. (Tr. I, 64-66). A few minutes later, petitioner moved over to sit by the victim. (Tr. I, 67-68). Petitioner continued to talk with Sadie and brought up the topic of sex. (Tr. I, 69-71). He said that sex was "perfectly natural" and good and she should feel free to have her boyfriend come over and do what they wanted while she was babysitting. (Tr. I, 71). The conversation made the victim uncomfortable. She just thought petitioner had too much to drink. (Tr. I, 71). Petitioner kept moving closer, and eventually his body was touching hers. (Tr. I, 72-73). He started making flattering comments, such as telling her she was beautiful. (Tr. I, 73). Maura was still asleep on the couch. (Tr. I, 73). The conversation made Sadie uncomfortable, but it would have made her more uncomfortable to say or do anything about it. (Tr. I, 74-75).

The victim seized the opportunity to go into the kitchen to get something, but petitioner went there as well. (Tr. I, 75-76). He stood up close to her and made more flattering remarks. (Tr. I, 77). She started looking at a magazine and petitioner talked about helping her out financially, suggesting he could get her things he pointed out in the magazine. (Tr. I, 78-79). This conversation just made Sadie feel more uncomfortable so she said that she was going to go to bed. (Tr. I, 81-82). She told petitioner she was familiar with the basement guest room and did not need to be shown anything, but petitioner insisted on bringing her down there. (Tr. I, 83).

When they got downstairs, the victim sat on the corner of the bed, and, a bit later, petitioner sat on the other corner of the bed facing her. (Tr. I, 86-88). After talking a few more

moments, petitioner leaned in and tried to kiss her on the lips. (Tr. I, 89). Sadie turned her head and said no but petitioner kept trying. (Tr. I, 89). Petitioner kept saying he would stop, but he continued. (Tr. I, 90). Eventually he stood up, grabbed the victim's ankles, pulled her down to the end of the bed and tried to pull her pants down. (Tr. I, 89-90, 92). She sat back up and tried to pull her pants up. (Tr. I, 92). Sadie kept asking him to stop and asking why he was doing this; "Maura and the kids are upstairs." (Tr. I, 93). But she was not speaking loudly even though she was nervous and afraid. (Tr. I, 93-94). She was a "very unconfrontational person. It wouldn't be in [her] nature to start yelling and making a big scene." (Tr. I, 94).

Sadie was only able to keep her pants up for a short time. Petitioner proceeded to kiss her in the area of her stomach and moving down. (Tr. I, 94). Eventually he reached her vagina and penetrated her with his tongue. (Tr. I, 95-96). The victim kept asking him to stop and reminding him his wife and children were upstairs. (Tr. I, 95). Petitioner was saying "you can't tell me you never thought about this before. No one would have to know. Doesn't this feel good?" (Tr. I, 95). Petitioner was kneeling on top of her. (Tr. I, 97). He pushed up her shirt and bra and was kissing and touching her breasts. (Tr. I, 97). The victim did not cry out. She was afraid of the whole situation, including being afraid of petitioner's wife coming down stairs. (Tr. I, 98).

Then petitioner's pants were down and he got on top of her, straddling her. (Tr. I, 99-100). He kissed her on her face and body but the victim kept turning her head away, saying no. (Tr. I, 100). Petitioner then forced himself inside her, having intercourse. (Tr. I, 101). She recalls him saying he couldn't stop and "Doesn't this feel good." He was grunting and groaning. (Tr. I, 102). Then there was a noise of someone walking around upstairs. (Tr. I, 102-103). Petitioner stopped what he was doing, got off the bed and put his pants back on. (Tr. I, 103-104).

Sadie scurried under the bed covers.  She was crying and afraid of the whole situation, including that someone was coming down.  ( Tr. I, 104).

When petitioner's wife came down the stairs, petitioner was standing at the end of the bed.  (Tr. I, 105-106).  Maura immediately demanded, "What's going on?"  (Tr. I, 106).  Petitioner just "fluffed it off," saying nothing was happening and telling his wife not to be ridiculous.  (Tr. I, 106).  Petitioner's wife was visibly upset and started yelling "What happened?"  at the victim.  (Tr. I, 107).  Sadie said, "I didn't do anything I told him no."  (Tr. I, 107-108).  Petitioner was standing behind his wife, motioning for Sadie to be quiet.  (Tr. I, 108).

Petitioner went upstairs while his wife was still yelling at Sadie.  (Tr. I, 110).  Maura tried to pull the covers off the victim but did not fully succeed.  (Tr. I, 108-109).  She was saying, "How can you do this to me after ten years of marriage?" and "She doesn't have any pants on."  Then she went upstairs. (Tr. I, 109).  After the victim got her clothes back together, she went upstairs.  Petitioner was near the front door, at the bottom of the stairs going up.  (Tr. I, 111).  His wife was on the couch, crying.  As the victim grabbed her pocketbook and was about to leave Maura started yelling, "How could you do this?" and "I trusted you."  (Tr. I, 111-112).  Sadie responded, "I didn't do anything."   (Tr. I, 112).  She also said, "I'm 19.  What would I want with your husband." (Tr. I, 188).

Sadie left the Scanzillos' house and got into her mother's van to drive away.  But after she started the car, she called her boyfriend.  (Tr. I, 112).  She was hysterical, sobbing, and had no idea what she was thinking.  (Tr. I, 112-113).  Sadie's boyfriend, Darren Fruzzetti, got the call at about 1:00 a.m.  (Tr. I, 206-207, 210).  The victim was crying and screaming, "How could he do this to me," over and over again.  (Tr. I, 210-211).  Darren could hear gagging noises, like she

was going to throw up. (Tr. I, 211). Sadie told Darren, "He forced himself onto me" and "He made me have sex with him." (Tr. I, 211). She was the most upset Darren had ever heard her. She was crying, repeatedly gagging, and "pretty much wailing the whole time." (Tr. I, 211).

Eventually, Darren told Sadie to drive directly to his house. (Tr. I, 212). On her way, Sadie called her best friend Sarah. (Tr. I, 114). When Sarah picked up the phone, at first all she could hear was screaming. (Tr. I, 229-230). Eventually, she realized it was Sadie who was "screaming uncontrollably." (Tr. I, 230). Sarah thought someone had died, but at some point Sarah understood Sadie saying, "He raped me, he raped me." (Tr. I, 230). Sarah agreed to meet the victim at Darren's house. (Tr. I, 231). When Sadie got to the house her lips were quivering, they were blue. Her teeth were chattering and she was very pale. (Tr. I, 213). She felt sick to her stomach. When she went into the bathroom, Darren could hear her dry heaving. (Tr. I, 217-218).

Sadie continued crying, shaking and feeling sick to her stomach while she was in Darren's house. (Tr. I, 218-220). Sarah and her father arrived after about 20-30 minutes. (Tr. I, 220, 233). Sadie was still distraught and very upset. She was shaking and sobbing. She continued doing so during the twenty-minute drive to Sarah's house, which was next door to Sadie's parent's home. (Tr. I, 234-235). When the victim's mother saw her that night, Sadie was minimally responsive and in a state of shock. (Tr. IV, 16). Her mother called the police and then Sadie was taken to Cape Cod Hospital. (Tr. I , 235; Tr. IV, 19).

The next evening, Sadie's mother received a phone call from petitioner. (Tr. IV, 20-21). He wanted to speak to the victim. He said he needed to apologize and had "overstepped his bounds" the night before. (Tr. IV, 21). When Sadie's mother accused him of raping her

daughter, at first petitioner denied it, and then he told her "not to open up anything [she] could not undo." (Tr. IV, 22).

Sadie admitted that just before Maura testified before the Grand Jury, Sadie called her at about midnight and asked her whether she was going to lie for petitioner. (Tr. I, 195-196). She also told Maura she loved her like a sister and she missed the kids. (Tr. I, 196). Maura responded that she was going to do what she had to do to protect her family. (Tr. I, 198).

Petitioner testified at trial and admitted to having a sexual encounter with the victim in the basement that night, but otherwise his version of what happened was quite different. He denied drinking any wine at the house after he and his wife got back from dinner. (Tr. IV, 75). While his wife was lying down on the couch, petitioner said he needed to go downstairs to get all the stuff off the guest bed. (Tr. IV, 79-82). The victim followed him downstairs and hopped onto the bed. (Tr. IV, 85-86). She told him to come over and sit for a second. (Tr. IV, 86-87). When he did, she put her arms around him and kissed him. (Tr. IV, 87). He claimed Sadie lifted up her own shirt, exposing her breasts. (Tr. IV, 88). Petitioner touched her and kissed her breasts. (Tr. IV, 88). He kissed her abdomen and then went lower to her vagina. (Tr. IV, 89-90). Then Sadie said, "Quick, Maura is coming." (Tr. IV, 90).

Petitioner jumped up and straightened himself up. (Tr. IV, 90). Petitioner's wife came down and said, "What's going on?" (Tr. IV, 92). The victim said nothing happened and that they were just fooling around. (Tr. IV, 93). Petitioner's wife became increasingly agitated and pulled the covers off Sadie. (Tr. IV, 94). His wife said, "Why would you risk ten years of marriage for something like this?" (Tr. IV, 96). Petitioner said nothing was going on, "Let's go to bed." (Tr. IV, 94-95). Then he went upstairs. (Tr. IV, 95).

Petitioner went on up to bed before his wife came upstairs. (Tr. IV, 95). When asked if he was in a panic because of what his wife had just discovered he said "you know, I was concerned about it." (Tr. IV, 97). Petitioner just went to bed after Sadie left the house. (Tr. IV, 97-98). Later that night his wife developed "belly pains," and they took her to the hospital where she had gall bladder surgery. She remained in the hospital for three days. (Tr. IV, 98-100). Both petitioner and petitioner's wife testified that before she left the house that night, Sadie said, "I don't know why I am doing this" and "I don't know why I did that." (Tr. IV, 97; Tr. V, 64). Maura also testified the victim said, "I'm nineteen. I don't need this shit." (Tr. IV, 64).

Maura claimed that she did not confront her husband at all that night after Sadie left. (Tr. V, 92). There was no argument. He was already asleep. (Tr. V, 92-93). According to Maura, her husband first told her "the truth about what happened" several days later when she came out of the hospital. (Tr. V, 93). Petitioner's wife also testified that the night before she testified before the Grand Jury, Sadie talked to her on the phone and said, "I never meant for this to happen." (Tr. V, 66-68). Sadie was crying throughout the call. (Tr. V, 68). The victim also said, "I didn't tell a lie." (Tr. V, 69).

Petitioner was indicted for three counts of indecent assault and battery on a person fourteen or over and two counts of rape. App. 4, 15. The MAC summarized the subsequent state court proceedings as follows:

> Before trial, [petitioner] filed a motion seeking medical and psychiatric records pursuant to *Commonwealth v. Bishop,* 416 Mass. 169 (1993), and *Commonwealth v. Fuller,* 423 Mass. 216 (1996) (*Bishop-Fuller*).[2] The motion was accompanied by an offer of proof and was further supported by an affidavit from a forensic

---

[2] Footnote 2 to the MAC's opinion, inserted at this point, states: "We note that the case was tried before the issuance of *Commonwealth v. Dwyer,* 448 Mass. 122, 139-150 (2006)."

psychologist who had been retained as an expert by [petitioner].[3] [Petitioner's] counsel filed the *Bishop-Fuller* motion on two grounds: first, the discovery might contain exculpatory evidence in the form of inconsistent statements by the victim; and second, there "may have been medical sequelae that would impact on [the victim's] credibility." After conducting a hearing, a Superior Court judge allowed the motion, with a "Stage 1 *Bishop* hearing [to be scheduled] to determine privilege."

Rather than pursue this discovery, however, trial counsel-after consultation with his client-considered that "it was more important to obtain an earlier trial date, jury waived, than could have been achieved if we waited for the *Bishop* motion to be resolved in all of the various stages." Trial counsel, an experienced member of the bar, called this decision "tactical." According to [petitioner's] wife, who was present at the time, trial counsel explained to [petitioner] that *Bishop-Fuller* "motions rarely yield useful information and require[ ] a lot of time because they [a]re decided in stages. He urged us to seek a quick trial rather than to pursue this motion." At this point, a particular judge was to be in the session in which the case was to be tried.

A three-day bench trial took place after the trial judge had conducted an extensive, detailed jury waiver colloquy. At trial, the defense did not deny a sexual encounter between [petitioner] and the victim (who was the nineteen year old babysitter of the defendant's children), but claimed that it had been consensual. The defense presented the case as a contest of credibility between the victim and [petitioner] over whether the encounter had or had not been consensual. The trial judge found [petitioner] guilty on the two rape indictments and one indictment of indecent assault and battery.

After having retained new counsel, [petitioner] moved for a new trial and for postconviction relief, including the discovery that had not earlier been pursued pursuant to the *Bishop-Fuller* motion. The motion judge, who had been the trial judge, granted the discovery sought and, further, on subsequent motions, allowed

---

[3] Footnote 3 to the MAC's opinion, inserted at this point, states: "In his affidavit, the expert opined that bulimia (from which the victim suffered) and its co-morbid disorders can include 'depression, dysphoria, suicidal behaviors, dissassociative [sic] experiences, excessive emotional lability, cognitive distortions and irrational beliefs as well as anxiety disorders and personality disorders.' As such, the expert stated that discovery of the victim's medical and psychiatric records would help him determine 'what impact her illness has on her cognitive abilities, including, but not limited to: recall, testimonial faculties, as well as emotional manifestations or issues such as fabrication, prevarication, false accusations, etc.'"

> additional discovery and permitted [petitioner's] new expert to examine the medical and psychiatric records obtained. After considering the materials so obtained (a process defense counsel urged), the judge denied the motion for a new trial.

*Scanzillo*, 71 Mass. App. Ct. 1122, 2008 WL 1901420, at *1, App. 502-03.

## ARGUMENT

**THE PETITION SHOULD BE DENIED  BECAUSE THE MAC'S DENIAL OF PETITIONER'S INEFFECTIVE ASSISTANCE CLAIM WAS NEITHER CONTRARY TO NOR AN UNREASONABLE APPLICATION OF *STRICKLAND V. WASHINGTON*.**

### A.   Standard of Review.

This Court's review of the petition is governed by 28 U.S.C. § 2254, *as amended by* the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), P.L. No. 104-132, Title I, § 104, 110 Stat. 1218 (effective April 24, 1996).  Under AEDPA, a federal court may not grant habeas relief with respect to a claim adjudicated on the merits in state court, unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or the decision was based on an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).  A decision is "contrary to" Supreme Court precedent if the state court "arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or the state court decides a case differently from [the Supreme] Court on a set of materially indistinguishable facts."  *Williams v. Taylor*, 529 U.S. 362, 413 (2000).  The term "clearly established Federal law" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." *Williams*, 529 U.S. at 412.  State court findings of fact "shall be presumed to be correct" unless

11

the petitioner rebuts the presumption "by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

The Supreme Court has held that *Strickland v. Washington*, 466 U.S. 668 (1984), supplies the clearly-established federal law relative to claims of ineffective assistance of counsel. *Williams*, 529 U.S. at 390-391.  To satisfy the *Strickland* standard, a defendant bears the burden of establishing two distinct elements: (1) deficient performance, and (2) prejudice.  466 U.S. at 687.  To satisfy the first prong of the *Strickland* test, a defendant must show that counsel's performance was constitutionally "deficient," meaning "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.  Under the performance prong, "there is a 'strong presumption' that counsel's strategy and tactics fall 'within the range of reasonable professional assistance,' and courts should avoid second-guessing counsel's performance with the use of hindsight."  *Knight v. Spencer,* 447 F.3d 6, 15 (1st Cir. 2006) (quoting *Strickland*, 466 U.S. at 689).  To establish prejudice under the second prong of the test, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694.

Under AEDPA, the burden is on petitioner to show that the state court applied *Strickland* in an "objectively unreasonable manner."  *Williams*, 529 U.S. at 409-410.  In assessing whether a state court has reasonably applied Supreme Court precedent, "it is the strength of the state court's ultimate conclusion, rather than its announced rationale, that must be evaluated."  *Rashad v. Walsh*, 300 F.3d 27, 35 (1st Cir. 2002) (citing *Ouber v. Guarino*, 293 F.3d 19, 34 (1st Cir. 2002)). An incorrect decision is not necessarily an unreasonable one.  *Hurtado v. Tucker*, 245 F.3d 7, 15-

16 (1st Cir. 2001) (citing *Williams*, 529 U.S. at 410). Rather, "some increment of incorrectness beyond error is required." *McCambridge v. Hall*, 303 F.3d 24, 36-37 (1st Cir. 2002) (en banc) (quoting *Francis S. v. Stone*, 221 F.3d 100, 111 (2d Cir. 2000)). "The more general the rule, the more leeway courts have in reaching outcomes in case by case determinations." *Yarborough v. Alvorado*, 541 U.S. 652, 664 (2004).

In evaluating the state court's denial of petitioner's federal claims, this Court must "'look through to the last reasoned decision' to determine the basis for the state court's holding." *Junta v. Thompson*, No. 09-2333, — F.3d —, 2010 WL 3171014, *3 (1st Cir. Aug. 12, 2010) (quoting *Malone v. Clarke*, 536 F.3d 54, 63 n. 6 (1st Cir. 2008)). Accordingly, the focus of the review in the instant case is the MAC's unpublished decision. *Id*.

> **B.     This Court Should Deny Ground Two Because the MAC's Decision Was Not "Contrary To" *Strickland*.**

In Ground Two of the petition, petitioner claims that "[t]he [state] trial court refused to follow the test set out in *Strickland* [*v. Washington*, 466 U.S. 668 (1984),] in considering the failure of [trial counsel] to obtain and present medical, psychiatric and character evidence, using her personal opinion instead of *Strickland*'s standard." Pet. at 8. This claim is misplaced. On habeas review, this Court must evaluate the last reasoned decision of the Massachusetts state courts—here, the MAC's May 1, 2008 decision. *Junta*, No. 09-2333, 2010 WL 3171014, at *3. The standard applied by the trial court is irrelevant unless the MAC perpetuated an alleged error of the trial court by failing to apply the correct legal standard on appeal. Here, the MAC applied the correct legal standard to petitioner's ineffective assistance claim.

In reviewing the trial court's rejection of petitioner's ineffective assistance claim, the MAC first expressly rejected petitioner's claim that the trial judge had applied "an incorrect,

subjective, standard." *Scanzillo*, 71 Mass. App. Ct. 1122, 2008 WL 1901420, at *2. The MAC then proceeded to evaluate petitioner's ineffective assistance claim under the legal rule set forth in *Commonwealth v. Saferian*, 366 Mass. 89, 96 (1974). *See Scanzillo*, 71 Mass. App. Ct. 1122, 2008 WL 1901420, at *3-4. It is well settled that "even if [a Massachusetts state court] does not cite *Strickland* for the ineffective assistance of counsel standard, the *Saferian* standard is 'functionally identical to the federal standard,' . . . and is therefore sufficient for habeas ineffective assistance claims." *Smiley v. Maloney*, 422 F.3d 17, 21 n.2 (1st Cir. 2005) (quoting *Mello v. DiPaolo*, 295 F.3d 137, 144 (1st Cir. 2002) and citing *Scarpa v. DuBois*, 38 F.3d 1, 7 n.4 (1st Cir. 1994); *Ouber*, 293 F.3d at 35). Here, as in *Smiley*, the state court's decision was not "contrary to" *Strickland* because the MAC "did not apply a rule that contradicts the *Strickland* principles, nor confronted a set of facts materially indistinguishable from the *Strickland* facts." *Id.* (citing *Williams*, 529 U.S. at 405-06).

### C. This Court Should Deny Ground One Because the MAC's Decision Was Not an "Unreasonable Application" of *Strickland*.

In Ground One of the petition, petitioner claims that his trial counsel was constitutionally ineffective for failing to pursue discovery of the medical and psychiatric records of victim and for failing to present evidence of petitioner's good character. *See* Pet. at 6. The Court should deny relief on Ground One because the MAC's rejection of petitioner's ineffective assistance claim was not objectively unreasonable.

As noted by the MAC, this case involved "experienced trial counsel's tactical (a term he used himself to characterize it) decision to forego the materials sought by the *Bishop-Fuller* motion in favor of an earlier trial date before a particular judge." *Scanzillo*, 71 Mass. App. Ct. 1122, 2008 WL 1901420, at *3. For several, independent reasons, the MAC concluded that this

tactical decision was not "manifestly unreasonable." *Id.* at *2-3. First, the reasonableness of the decision to proceed before this particular judge is bolstered by the fact that the "trial judge did not convict on two of the indictments, sentenced the [petitioner] to less than the term urged by the Commonwealth, and declined to impose life parole." *Id.* at *3. Second, it was reasonable for trial counsel to conclude that the benefits of proceeding with an earlier trial before a particular judge outweighed the potential benefits of pursuing the *Bishop-Fuller* motion because the information sought—medical and psychiatric records bearing on credibility—"may well not have satisfied the *Bishop-Fuller* standard," *id.* (citing *Commonwealth v. Bourgeois*, 68 Mass. App. Ct. 433, 436-37 (2007)), and, in any event, "the proffered expert opinions that the victim, as a result of bulimia and associated illnesses, had 'credibility-eroding traits' and was 'inclined to lie, particularly under stress' were inadmissible" because "[a]n expert may not intrude upon the function of the jury to assess the credibility of a witness." *Id.* (gathering cases).

On habeas review, this Court may not revisit the MAC's conclusion that the proffered expert testimony would have been inadmissible under state law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("[F]ederal habeas corpus relief does not lie for errors of state law."). Moreover, the MAC's conclusion that the *Bishop-Fuller* motion was unlikely to produce any admissible evidence provides an independent an adequate state-law basis for denying petitioner's ineffective assistance claim. *Cone v. Bell*, 129 S. Ct. 1769, 1780 (2009) (federal habeas courts will not review question of federal law where state court decision rests on adequate and independent state law ground). Trial counsel cannot be faulted for failing to pursue a motion that had a minimal chance of success. *See Vieux v. Pepe*, 184 F.3d 59, 64 (1st Cir. 1999) (trial counsel's performance not deficient under *Strickland* for declining to pursue a futile tactic); *United States v.*

*Ortiz*, 146 F.3d 25, 28 (1st Cir. 1998) (trial counsel not ineffective for declining to file suppression motion that "he reasonably believed would be of no benefit to his client"); *Barry v. Ficco*, 392 F. Supp. 2d 83, 95 (D. Mass. 2005) (trial counsel not ineffective for failing to file suppression motion that "would not have succeeded"); *United States v. Santiago*, 474 F. Supp. 2d 209, 213 (D. Mass. 2007) (deferring to trial counsel's decision not to file motion to suppress where court would have been "unlikely" to grant motion); *Lopez v. Spencer*, 961 F. Supp. 332, 337 (D. Mass. 1997) (trial counsel not ineffective for failing to file a motion to suppress that "had no reasonable likelihood of success on the merits").

  Finally, petitioner cannot demonstrate that trial counsel's alleged shortcomings prejudiced his case. With respect to the failure to pursue the *Bishop-Fuller* motion, as discussed above, there can be no prejudice where the information sought would have been inadmissible as a matter of state law. Moreover, as the MAC correctly noted, "[c]redibility and the victim's reasons for lying, were the central themes of the trial, even without the *Bishop-Fuller* materials." *Scanzillo*, 71 Mass. App. Ct. 1122, 2008 WL 1901420, at *4. Here, "[d]efense counsel through vigorous cross-examination and argument was able to press the theory that the victim had many reasons to lie about the nature of the encounter." *Id.* Thus, the information sought in the *Bishop-Fuller* motion—to the extent any of it would have been admissible—would have provided only incremental support for these defense themes. And, contrary to petitioner's assertions, the Commonwealth's case was not limited to "the completely uncorroborated testimony" of the victim. Pet. Memo. (Dkt # 4) at 8. Rather, the victim's testimony was corroborated by "fresh complaint" testimony and by the testimony of those who observed the victim's emotional state in

the aftermath of the rape.  *See, e.g.,* Tr. I, 210-11 (victim's boyfriend); Tr. I, 229-30 (victim's friend); Tr. IV, 16 (victim's mother); Tr. IV, 31-44 (police officer).

With respect to the affidavits proffered by petitioner, portraying petitioner as "honest, trustworthy, gentle, considerate, and kind,"  it was not unreasonable for the MAC to conclude that this character evidence would have held "little or no weight" where, even by petitioner's own account, he had had a sexual encounter with the family's nineteen-year-old babysitter in the basement of his house while his wife and children slept upstairs.  *Id.*  In sum, the MAC reasonably concluded that trial counsel's tactical decision not to pursue the *Bishop-Fuller* motion was within the range of competent assistance and that neither the failure to pursue that motion nor the failure to present character evidence prejudiced petitioner's case.  Accordingly, this Court should deny the petition with prejudice.

## **Conclusion**

For the foregoing reasons, Respondents John J. O'Brien and Harold W. Clarke respectfully request that the Court deny the petition for a writ of habeas corpus filed by Petitioner Mark Scanzillo.

                    Respectfully submitted,

                    MARTHA COAKLEY
                    ATTORNEY GENERAL

                    __*/s/ Jessica V. Barnett*_____
                    Jessica V. Barnett (# 650535)
                    Assistant Attorney General
                    Criminal Bureau
                    One Ashburton Place
                    Boston, Massachusetts  02108
                    (617) 727-2200, ext. 2842
                    jessica.barnett@state.ma.us

Dated:  September 10, 2010

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on September 10, 2010.

*/s/ Jessica V. Barnett*
Jessica V. Barnett
Assistant Attorney General